## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**LG SCIENCES, LLC, a Nevada**
**Limited Liability Company, and E**
**& F DISTRIBUTORS, LLC, a**
**Michigan Limited Liability**
**Company,**

                          Plaintiffs,

                                             No. 2:12-cv-14843

  vs.                                      Hon. Gerald E. Rosen

**MASS NUTRITION, INC., a**
**Florida For Profit Corporation, and**
**MASS NUTRITION II, INC., a**
**Florida For Profit Corporation,**

                          Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT AND DENYING DEFENDANTS' MOTION FOR SANCTIONS PURSUANT TO RULE 11

### I. INTRODUCTION

This case arises out of the parties' business relationship with regards to the sale of Plaintiffs' nutritional supplements. When that relationship soured, Plaintiffs sought relief in this Court. Plaintiffs' five-count Amended Complaint (Complaint) sounds in contract, quasi-contract, and tort. Defendants have now

moved to dismiss Plaintiffs' Complaint and for sanctions.[1]  Having reviewed the parties' briefs in support of and in opposition to Defendants' motions and the accompanying exhibits, the Court finds that the relevant facts, allegations, and legal arguments are adequately presented in these written materials, and that oral argument would not aid the decisional process.  Accordingly, the Court will decide Defendants' motions "on the briefs."  *See* Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan.  The Court denies Defendants' motions for the reasons set forth below.

## II. FACTUAL BACKGROUND

LG Sciences and E&F Distributors (collectively, Plaintiffs) manufacture, distribute, and sell sports nutrition supplements.  (Plfs' Compl., Dkt. # 10, at ¶¶ 10, 18).  They do so through their own traditional retail methods, as well as through wholesalers.  (*Id.* at ¶ 10).  During the course of their wholesale operation, Plaintiffs entered into a business relationship with Mass Nutrition (Defendants),[2]

---

[1] In violation of Eastern District of Michigan Local Rule 7.1(a)(2), Defendants did not indicate whether it sought Plaintiffs' concurrence in the relief sought in the present motions.  Plaintiffs answer this question in the negative.  (Plfs' Resp., Dkt. # 17, at ¶¶ 4-7).  Defendants and their counsel are cautioned to comply with Local Rule 7.1(a) when filing any further motions in this case.  Failing to do so may lead to fines or other sanctions.

[2] Defendants assert that "Mass Nutrition II, Inc. is a corporation which is separate and distinct from [Mass Nutrition, Inc.], which has nothing to do with the transactions giving rise to this action."  (Def's Br., Dkt. # 15, at 5).  For the purposes of this Motion, however, the Court must accept Plaintiffs' allegations as true.

where Mass Nutrition purchased Plaintiffs' products at wholesale for later sale by Mass Nutrition to consumers at retail.  (*Id.* at ¶ 11).  Over the course of this relationship, Defendants purchased in excess of one million dollars' worth of supplements from Plaintiffs.  (*Id.* at ¶ 17).

The principal product at issue here is a supplement package called the "Trifecta Stack" kit.  The kit is a packaged product composed of three nutrition supplements: "Methyl 1-D," "MMv3," and "Formadrol Extreme."  (*Id.* at ¶ 10, n. 1).  All Trifecta Stack kits include instructions for using the supplements over the course of a seven-week program, including how to properly and safely use the three products in conjunction with one another.  (*Id.* at ¶ 33).  The kits also include a free diet and exercise guide, all of which are packaged together in a specialized box.  (*Id.* at ¶ 66).

It is a well-known common practice in the dietary supplement industry to have two distinct kinds of promotions, one benefiting the retailer and one benefiting the consumer.  (*Id.* at ¶ 30).  The latter incentivizes consumer sales by either including a free promotional item or by offering a reduced price (such as for bulk quantities or packaged items) to consumers, while the former only provides purchase discounts to wholesalers (such as "buy two, get one free or an extra ten percent off the entire order.").  (*Id.*).  As set forth below, the Trifecta Stack kit packaged by Plaintiffs for sale by Defendants was meant to benefit the consumer;

it packaged individual items at a combined lower price than a consumer would pay if all three individual items were purchased separately *and* included a free promotional item in order to incentivize the consumer to purchase the packaged kit in lieu of purchasing the products individually. (*Id.* at ¶¶ 21, 31). In this case, the free promotional item was either of two kinds of additional supplements, "Ghenerate" or "IGH 1-60 Count." (*Id.* at ¶¶ 23, 34, 38-40). Plaintiffs marked these promotional items as "samples." (*Id.* at ¶ 35).

In August 2008, agents for Plaintiffs and Defendants, Eric Marchewitz and Todd Rosenfeld, respectively, engaged in discussions resulting in Defendants purchasing the Trifecta Stack kit at a discounted rate with a promotional product. (*Id.* at ¶ 36). The parties intended that this "special customer facing promotion" -- created by Plaintiffs for Defendants -- would incentivize end consumer purchases. (*Id.* at ¶ 38). Defendants retailed the Trifecta Stack kit and its free promotional item (IGH-1 60 Count) to consumers for $74.95 from October 2008 through February 2010 (when IGH-1 60 Count went out of stock). (*Id.* at ¶¶ 38-39; Ex. 1 to Plfs' Compl., Dkt. # 14-2). Defendants continued to sell the Trifecta Stack kit without the promotional item from February through June 2010, but sales suffered. (Plfs' Compl., Dkt. # 14, at ¶ 39). In June 2010, the parties entered into a similar agreement to use a different promotional item, GHenerate, in an attempt to raise sales back to original volumes under the IGH-1 60 Count promotion. (*Id.* at ¶ 40).

4

During the course of this business relationship, Defendants implied and represented that they were purchasing these kits for sale at retail in the same manner. (*Id.* at ¶¶ 12, 29). Indeed, Plaintiff exclusively intended these kits to be sold as kits at retail. (*Id.*). Defendants' website even advertised the kits -- with a free promotion -- to consumers as a package deal. (*Id.* at ¶ 34). The parties, verbally and via electronic mail communications, memorialized these intentions. (*Id.* at ¶ 41). As a result of these agreements, between October 2008 and February 2012, Defendants ordered and purchased a total of 12,652 Trifecta Stack kits in twenty-seven separate purchases. (*Id.* at ¶¶ 27-28(a-aa)). The wholesale value of these purchases was $659,385.80, not including the 12,652 promotional bottles of GHenerate at no additional cost. (*Id.* at ¶ 27).

This relationship turned south in August 2012 when Rosenfeld admitted to Marchewitz that he was purchasing the Trifecta Stack kits not with the intent to sell the kits as a single unit, but rather with the intent to sell the individual items within the kits individually. (*Id.* at ¶ 43). Defendants also sold the promotional products as individual items. (*Id.* at ¶ 44). As a result, Plaintiffs took steps to prevent Defendants from continuing to sell the items within the Trifecta Stack kits individually, including changing the labeling to prevent individual sale by marking the individual bottles contained within the Trifecta Stack kit as "Not for individual sale" with bright yellow stickers. (*Id.* at ¶¶ 21, 45). Defendants' sales plummeted,

and they ultimately terminated the business relationship with Plaintiffs.  (*Id.* at ¶ 45).

Plaintiffs assert that Defendants agreed to a contract for the purchase of goods at the wholesale price for later retail sale as a kit, yet turned around and broke up the packaged individual units for individual sale at retail price.  This difference, measured over a few years, resulted in a net gain to Defendants of over $270,000.  (*Id.* at ¶ 53).  When one adds in the value of the promotional units sold by Defendants, this figure increases another $110,000.  (*Id.*).

Independent of this general scheme, Plaintiffs also claim that in September 2008, Defendants fraudulently represented to Plaintiffs that they had not received a shipment of 480 units of IGH-1 60 Count promotional supplements.  (*Id.* at ¶ 92).  Plaintiffs consequently reshipped Defendants an additional 480 units, labeled "Not for Individual Sale."  (*Id.* at ¶¶ 94-95).  Defendants then packaged and resold these promotional units as their own, to the tune of $7,188.00 in profit.  (*Id.* at ¶ 95).  Not only were Defendants not entitled to sell these units as their own, Plaintiffs assert that this ate into Plaintiffs' own retail sales of these units.  (*Id.*).

Plaintiffs filed their initial Complaint on October 31, 2012.  (Dkt. #1).  In lieu of an answer, Defendants filed a motion to dismiss.  (Dkt. # 8).  Plaintiffs then amended their Complaint, asserting five separate violations of Michigan law.  (Dkt. # 14).  The first three sound in contract: breach of express contract; breach of

6

implied contract; and unjust enrichment.  Plaintiffs' last two claims sound in tort.
Count IV, "Silent Fraud," asserts that Defendants fraudulently concealed material
facts when entering into and performing work under the various agreements
regarding Defendants' sale of the Trifecta Stack kits.  The final count, Count V, is
a fraud claim arising out of Defendants' September 2008 representation that it did
not receive the shipment of 480 units of IGH-1 60 Count promotional supplements.
Defendants have now again moved to dismiss Plaintiffs' Complaint.

### III. DISCUSSION

#### A.    Standard of Review

In deciding a motion brought under Rule 12(b)(6), the Court must construe
the complaint in the light most favorable to Plaintiffs and accept all well-pled
factual allegations as true.  *League of United Latin Am. Citizens v. Bredesen*, 500
F.3d 523, 527 (6th Cir. 2007).  To withstand a motion to dismiss, however, a
complaint "requires more than labels and conclusions, and a formulaic recitation of
the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550
U.S. 544, 555 (2007).  The factual allegations in the complaint, accepted as true,
"must be enough to raise a right to relief above the speculative level," and must
"state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial
plausibility when the plaintiff pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for defendant's conduct." *16630 Southfield Limited P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013).

The Sixth Circuit has emphasized that the "combined effect of *Twombly* and *Iqbal* [is to] require [a] plaintiff to have a greater knowledge . . . of factual details in order to draft a 'plausible complaint.'" *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) (citation omitted). Put another way, complaints must contain "plausible statements as to when, where, in what or by whom," *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 373 (6th Cir. 2011), in order to avoid merely pleading "unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

**B.     Analysis**

**1.     Plaintiffs' breach of contract claim (Count II) states a claim for relief**

The underpinning of Plaintiffs' breach of express contract claim is quite simple: they entered into an agreement to sell the Trifecta Stack kits to Defendants at wholesale for Defendants to sell as a packaged entity at retail and Defendants breached this contract when it sold the individual products within the kits individually. Defendants assert that the statute of frauds bars this claim, and in the alternative, that Plaintiffs have not pled sufficient facts to state a claim under

8

*Twombly/Iqbal*.  As set forth in more detail below, the Court rejects Defendants' arguments.

> **a.     The Statute of Frauds does not bar Plaintiffs' breach of contract claim**

Defendants assert that because Plaintiffs' Complaint provides that an "express contract was formed, *without a writing*, even though the amounts of goods contracted for sale in question total in excess of $500 because all parties are merchants," (Plfs' Compl., Dkt. # 14, at ¶ 57) (emphasis added), the statute of frauds bars Plaintiffs' claim.  The parties do not dispute that the UCC governs this matter.  Section 2-201 of the UCC, as codified in Michigan, provides as follows:

> Except as otherwise provided in this section, a contract for the sale of goods for the price of $1,000.00 or more is not enforceable by way of action or defense unless there is a writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought.

M.C.L. § 440.2201(1).  This provision "does not require that the terms of a contract for the sale of goods, other than the quantity term, be expressed in writing. The requirements of § 2–201 are satisfied if the writing indicates that 'a contract of sale has been made between the parties' and 'specif[ies] a quantity.'"  *Lorenz Supply Co. v. American Standard, Inc.*, 419 Mich. 610, 614 (1984) (citation omitted).

That Plaintiffs have not alleged a writing was contemporaneously created in August 2008 when Marchewitz and Rosenfeld entered into a business relationship

is not as fatal as Defendants suggest.  This is because Plaintiffs affirmatively pled that "the context of the arrangement, the business relationship between the parties and their oral and *written communications*" indicate the formation of an express contract on the terms alleged by Plaintiff -- that Defendants would sell the Trifecta Stack kit as a package.  (Plfs' Compl., Dkt. # 14, at ¶¶ 41, 58) (emphasis added). In response to Defendants' Motion, Plaintiffs also produced paid invoices and orders signed by Defendants' agents specifying various quantities of Trifecta Stack kits.  (Exs. A & B to Plfs' Resp., Dkt. ## 17-1 & 17-2).[3]

That these writings do not expressly reference any other contractual "terms" does not lead to the conclusion that Defendants set forth -- the only terms of the contract are those regarding price and quantity and not regarding how Defendants were to sell the Trifecta Stack kits.  (Defs' Br., Dkt. # 13, at 13-14).  This is because Michigan caselaw interpreting the UCC holds that "Section 2-201 does not require that the terms of a contract for the sale of goods, other than the quantity term, be expressed in writing."  *Lorenz*, 419 Mich. at 614.  "A writing that satisfies § 2-201 does not prove the terms of a contract; such a writing merely removes the statutory bar to the enforcement of the contract whether its terms—other than the

---

[3] Plaintiffs attached these documents in response to Defendants' Motion.  This Court may consider these documents without treating Defendant's Motion as one for summary judgment because they were referred to in Plaintiffs' Complaint and are central to their claims. *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997).

quantity term which alone must be specified in writing—be written, oral, or partly written and partly oral." *Id.* at 615-16. Plaintiffs have therefore plausibly asserted that a writing exists sufficient to fit within the statute of frauds.

Plaintiffs have also adequately alleged that this claim alternatively falls outside the statute of frauds. The statute of frauds does not apply "[w]ith respect to goods for which payment has been made and accepted or that have been received and accepted." § 440.2201(3)(c). Specifically, Plaintiffs have set forth facts indicating that the oral agreement between Marchewitz and Rosenfeld became enforceable through performance. *Power Press Sales Co. v. MSI Battle Creek Stamping*, 238 Mich. App. 173, 179 (1999). For example, Plaintiffs assert that Marchewitz and Rosenfeld "discussed, in order to drive more sales, a special customer facing promotion would be created by LG Sciences and highlighted by Mass Nutrition to give incentive to the end consumer matching a free product with the Trifecta Stack." (Plfs' Compl., Dkt. # 14, at ¶ 38). Defendants then partially performed their responsibilities under the contract by ordering, paying for, and accepting the Trifecta Stack kits (with promotional supplements), as well as making the kits available for purchase on Defendants' website as per the alleged contract. (*Id.* at ¶¶ 27-28(a-aa), 34; Exs. 1-2, 4, 7 to Plfs' Compl., Dkt. ## 14-2, 3,

5, 8).[4]  Such performance would plausibly lift this claim outside the statue of frauds.

### b.  Plaintiffs' breach of contract count states a claim for relief

Defendants alternatively attack Plaintiffs' breach of contract claim for failing to satisfy Rule 8(a)'s pleading standards as set forth in *Twombly* and *Iqbal*. Contrary to Defendants' assertion, "[t]he Court [does not need to] search the Complaint in vain to find any meaningful allegations of actual factual material." (Defs' Br., Dkt. # 15, at 11).  Plaintiffs' Complaint contains a multitude of statements regarding the when, where, in what or by whom that plausibly support a breach of contract claim.  *Ctr. for Bio-Ethical Reform*, 648 F.3d at 373.  Here, Plaintiffs have alleged that the parties' agents entered into a business relationship beginning in August 2008 concerning the resale of Plaintiffs' Trifecta Stack kits. Plaintiffs assert that based on the parties' negotiations, conduct, industry standards, and oral and written communications, the parties agreed that Defendants would purchase the kits at discount and then sell them to consumers as kits.  Defendants then purchased the kits twenty-seven different times and screenshots of

---

[4] Defendants argue that they "have performed their contractual duties as a purchaser of goods -- to accept and pay for the goods in accordance with the contract.  Nothing in Article 2 imposes upon a buyer the contractual obligation to use the goods in accordance with the seller's alleged 'impressions' or expectations."  (Def's Br., Dkt. # 15, at 13-14) (citing MCL § 440.2301).  This may be the case, but this is not what Plaintiffs have alleged and is rather something that is best addressed during discovery.

Defendants' website attached to the Complaint confirm that Defendants acted consistently with this agreement.  Defendants' agent subsequently admitted that it was breaking up these kits and selling the units individually.  These are more than enough facts to plausibly state a claim for breach of contract, as well as for Plaintiffs' quasi-contractual theories.

### 2.    Plaintiffs' alternative breach of contract claims (Counts I and III) state claims for relief

Under Michigan law, a plaintiff cannot assert quasi-contractual theories if an enforceable express contract exists.  *Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 181 (6th Cir. 1996) ("Where the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel and unjust enrichment."); *Kingsley Associates, Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 506 (6th Cir. 1995) ("[T]he existence of an implied-in-fact contract, which provides a legal remedy, will bar a claim of unjust enrichment, which seeks an equitable remedy.").  Defendants argue that because Plaintiffs have pled that the parties entered into an express contract, Plaintiffs' quasi-contractual theories must be dismissed.  (Defs' Br., Dkt. # 15, at 14-15).  Plaintiffs maintain that at this stage in the litigation, they are not required to "pick a theory on which they wish to proceed," pointing rather to the alternative pleading standards set forth in the Federal Rules of Civil Procedure.  (Plfs' Resp., Dkt. # 17, at 13).  Specifically, Rule 8(d) provides that:

> A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient. . . . A party may state as many separate claims or defenses as it has, regardless of consistency.

Fed. R. Civ. P. 8.  "In other words, a pleading does not become insufficient by reason of a party having made alternative, or even contradictory, claims." *Detroit Tigers, Inc. v. Ignite Sports Media, LLC.*, 203 F. Supp. 2d 789, 793 (E.D. Mich. 2002) (citing *Rowe v. Cleveland Pneumatic Co.,* 690 F.2d 88, 92 (6th Cir. 1982)).

Plaintiffs have, in so many words, "kept [their] options open [for the possibility that Defendants] . . . may deny the existence of a contract." *Terry Barr Sales Agency*, 96 F.3d at 182 (reinstating dismissal of quasi-contract claims and noting that if the Defendant admits the existence of a valid contract, "it will be appropriate for the district court to dismiss [plaintiffs]' claims for unjust enrichment and promissory estoppel at that time."); *Cascade Elec. Co. v. Rice*, 70 Mich. App. 420, 427 (1976) ("Under the circumstances it is clear that plaintiff was not required to elect to proceed under one theory or the other, but could seek recovery on the basis either of an express verbal contract, or an implied contract if the [fact finder] found that the express verbal contract did not exist.").  Though the presence of an express contract would defeat Plaintiffs' alternative theories, Defendants' argument regarding that claim reinforces Rule 8(d)'s policy undertones.  Defendants assert, as set forth above, that Plaintiffs cannot bring an

14

express contract claim because that claim is barred by the statute of frauds. At the same time, they also rely upon Plaintiffs' express contract claim in an attempt to defeat their quasi-contractual claims. Defendants cannot have it both ways and the discovery vehicle -- not a 12(b)(6) motion -- is the appropriate place to refine these positions.

Accordingly, and because this matter is still "[a]t the pleading stage, the Court believes it is premature to dismiss . . . [Plaintiffs'] alternative count[s] based on quasi contract before the parties have had the benefit of discovery and their positions have gelled." *Alexander Associates, Inc. v. FCMP, Inc.*, 2012 WL 1033464, at *12 (E.D. Mich. Mar. 27, 2013); *see also Detroit Tigers*, 203 F. Supp. 2d at 793 ("Plaintiff has pleaded in the alternative; either there is an express contract between the parties . . . , or else Plaintiff is entitled to a quasi-contractual remedy . . . . For these reasons, granting dismissal of the entire Complaint is not a proper disposition in the instant case."); *Wake Plumbing & Piping, Inc. v. McShane Mech. Contracting, Inc.*, 2012 WL 6591664, at *3 (E.D. Mich. Dec. 18, 2012) ("At this stage, Plaintiff's claim for breach of contract in count one will not be construed as an admission against another alternative or inconsistent pleading in the same case. Although Plaintiff will not be able to recover damages on both its contract and quasi-contractual theories, Plaintiff may allege a promissory estoppel

15

claim in the alternative to a breach of contract claim under Rule 8(d).") (collecting

similar cases).

### 3.    Plaintiffs have stated claims for silent fraud and fraud

Plaintiffs' "Silent Fraud" claim (Count IV) generally tracks the factual

assertions made with respect to their contract claims:

- "Defendants gave Plaintiffs the false impression that Defendants were selling the Trifecta Stack as a single packaged item and were only using the GHenerate for promotional purposes with the purchase of the Trifecta Stack." (Plfs' Compl., Dkt. # 14, at ¶ 86);

- "Throughout the discussions between the parties, both verbally and through electronic mail, Defendants repeatedly failed to disclose the actual means by which Defendants were selling the Trifecta Stack components." (*Id.* at ¶ 87);

- "Defendants had the intent to deceive in this failure to disclose because Defendants were making increased profits through the enrichment and benefit of the promotional prices . . . and continued this intent of conveying this false impression at every conversation and re-order of the Trifecta Stack." (*Id.* at ¶ 88); and

- "Defendants had a duty to disclose because they were aware that Plaintiffs [understood] . . . that the terms of their arrangement for the sale of the Trifecta Stack, at wholesale, was that the packaged product be sold as a single item and that the Ghenerate product was promotional for the end purchasing consumer only." (*Id.* at ¶ 89).

Plaintiffs' fraud claim (Count V) is unrelated to the general averments in

their other four counts.   This Count relates not to the nature of the parties'

agreement concerning Trifecta Stack kits.  Instead, it specifically asserts that: (a)

Plaintiffs shipped 480 units of promotional supplements to Defendants in

16

September 2008; (b) Defendants falsely represented that they did not receive these 480 units; (c) Plaintiffs shipped an additional 480 units of promotional supplements; (d) Defendants packaged these promotional supplements together as a "120 count" bottle; and (e) Defendants sold these promotional supplements. (*Id.* at ¶¶ 91-95). Therefore, Plaintiffs assert, Defendants defrauded Plaintiffs out of "legitimate sales of IGH-1, 100 count bottles and pocketing $29.99 per fraudulently acquired combo of 'Not for Individual Sale' bottles." (*Id.* at ¶ 95).

Defendants argue that these claims are not extraneous to the alleged breach of contract and therefore are precluded by the "economic loss doctrine." Defendants also assert that these claims are not pled with specificity pursuant to Federal Rule of Civil Procedure 9(b). These arguments are not persuasive.

### a.     Defendants' economic loss doctrine argument is premature

Under the economic loss doctrine, "[w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only economic damages." *Neilbarger v. Universal Cooperative, Inc.*, 439 Mich. 512, 520 (1992). The purpose of the doctrine is to prevent contract law from "drown[ing] in a sea of tort." *Id.* at 528 (citation omitted). This is because "contract principles . . . are generally more appropriate for determining claims for consequential damages that the parties have, or could have, addressed in their agreement." *Id.* at 521.

17

At first, Michigan only applied this doctrine to unintentional torts. *Huron Tool and Eng'g Co. v. Precision Consulting Servs.*, 209 Mich. App. 365, 368 (1995). In *Huron Tool*, the Michigan Court of Appeals extended the doctrine to cover intentional torts as well. *Id.* at 371-75. Notwithstanding this extension, the doctrine does not cover *all* intentional torts, as the *Huron Tool* court expressly carved out "fraud in the inducement as the only kind of fraud claim not barred by the economic loss doctrine." *Id.* at 371. In *Huron Tool*, the court drew the line between fraud that is extraneous to a contract and fraud that is not:

> Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely - which normally would constitute grounds for invoking the economic loss doctrine - but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior. In contrast, where the only misrepresentation by the dishonest party concerns the *quality or character of the goods sold*, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods.

*Id.* at 372-73 (emphasis added). In short, "[f]raud in the inducement . . . addresses a situation where the claim is that one party was tricked into contracting. It is based on pre-contractual conduct. . . . [It], by definition, redresses misrepresentations that induce the buyer to enter into a contract but that do not in themselves constitute contract or warranty terms subsequently breached by the seller." *Id.* at 370, 375. Accordingly, there is a distinction between "fraud

extraneous to the contract and fraud interwoven with the breach of contract." *Id.* at 373.

The Michigan Supreme Court endorsed this expansion in *General Motors Corporation vs. Alumi-Bunk, Inc.,* 482 Mich. 1080 (2008), where it upheld the trial court's application of the doctrine "for the reasons stated in the Court of Appeals dissenting opinion." *Id.* at 1080. There, the parties entered into a sales contract where defendant, Alumi-Bunk, purchased 147 Chevrolet Silverado trucks from one of General Motors' Ohio dealers at a "substantial discount." *Gen. Motors. Corp. v. Alumi-Bunk, Inc.*, 2007 WL 2118796, at * 1 (Mich. Ct. App. July 27, 2007), *rev'd in part*, 482 Mich. 1080 (2008). General Motors claimed that that Alumi-Bunk agreed to modify or "upfit" the vehicles prior to resale so that they would not compete with other dealers, though this term was not in the sales contract. *Id.* Alumi-Bunk, however, sold the vehicles without modification and General Motors subsequently sued, alleging, among other things, breach of express/implied contract and fraud in the inducement. *Id.* In finding that the economic loss doctrine did not apply, the Court of Appeals reasoned that because the alleged fraud "induce[d] [GM] to enter into the original agreement . . . . [t]he alleged misrepresentations did not 'relate to the breaching party's performance of the contract.'" *Id.* at * 6.

The dissent rejected this narrow reasoning and rather found that GM's Complaint allegations regarding "[t]he alleged misrepresentations that form the basis of GM's fraud claim are precisely the same as those alleged in its breach of contract claim." *Id.* at * 10 (Kelly, J., dissenting).   GM's fraud and misrepresentation claims, for example, asserted that Alumi-Bunk represented that the vehicles "*would be upfitted* before the resale of those vehicles to the general public." *Id.*  Similarly, its breach of contract claim alleged that Alumi-Bunk could purchase vehicles "on the condition *that Alumi-Bunk upfit* any such vehicles before reselling them to the general public." *Id.*   Given these similarities, the dissent concluded, "the fraud allegations are not extraneous to the contractual dispute as GM's allegations of fraud are so intertwined with its allegations of breach of contract to be indistinguishable." *Id.* at * 10.

This Court need not, however, examine whether the economic loss doctrine bars Plaintiffs' silent fraud count at this juncture.   Consistent with the Federal Rule's alternative pleading scheme discussed earlier, Defendants' argument on this issue is premature and another attempt to have it both ways -- Defendants rest their economic loss doctrine defense on the basis of a contract they dispute existed. *See Metropolitan Alloys Corp. v. Considar Metal Mktg.*, 2007 WL 2874005, at * 7 (E.D. Mich. Sept. 25, 2007) (noting that the express allegation of a breach of contract claim does not automatically defeat a fraud in the inducement claim

because "a plaintiff may pursue two or more theories of recovery in the alternative and 'regardless of consistency'") (citation omitted).

### b.   Plaintiffs' claims are pled with specificity

Defendants also argue that these claims do not satisfy Federal Rule of Civil Procedure 9(b), which mandates that "a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "In order to meet the 'particularity' requirement of Rule 9(b), 'a plaintiff [must] allege the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'"  *Indiana State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 719 F.3d 498, 503 (6th Cir. 2013) (citations omitted and alterations in original).  "The threshold test is whether the complaint places the defendant on sufficient notice of the misrepresentation, allowing the defendants to answer, addressing in an informed way plaintiff's claim of fraud."  *Coffey v. Foamex L.P.,* 2 F.3d 157, 162 (6th Cir. 1993) (internal quotations and corrections omitted).

As a preliminary matter, the Court declines to breathe life into Defendants' argument that Plaintiffs' fraud claims do not meet Rule 9(b)'s pleading standard. Defendants offers no argument as to why Plaintiffs' fraud claims are not pled with the requisite specificity and rather, after briefly citing relevant pleading standards,

21

just provides this wholly conclusory offering: "Defendants submit that Counts IV and V of Plaintiffs' amended complaint fail to allege the supposed claims of fraud with the required specificity and, accordingly should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6)." (Defs' Br., Dkt. # 15, at 19). In arguing that Plaintiffs' fraud claims are so barren so as to not pass muster under Rule 9(b), Defendants ironically support their argument with wholly conclusory language, which merits waiver of this argument. *Spirko v. Mitchell*, 368 F.3d 603, 612 (6th Cir. 2004) (failure to develop an argument constitutes a waiver); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation omitted and alteration in original).

Even if this were not the case, Plaintiffs have stated the circumstances constituting the two alleged frauds with particularity sufficient to satisfy Rule 9(b). To establish an actionable claim of fraud under Michigan law, a plaintiff must establish: "(1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance

22

upon it; and (6) that he thereby suffered injury." *Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336 (1976). Though an action for fraud may not generally rely upon future events, "an unfulfilled promise to perform in the future is actionable when there is evidence that it was made with a present undisclosed intent not to perform. Furthermore, 'the mere fact that statements relate to the future will not preclude liability for fraud if the statements were intended to be, and were accepted as, representations of fact, and involved matters peculiarly within the knowledge of the speaker.'" *Foreman v. Foreman*, 266 Mich. App. 132, 143 (2005) (citations omitted).

As to Plaintiffs' silent fraud claim, Plaintiffs allege that in August 2008, Marchewitz and Rosenfeld negotiated the terms of a business relationship concerning the sale of the Trifecta Stack kits. They also alleged that Defendants concealed their true intentions for entering into this relationship -- to sell the Trifecta Stack kit's individual components for their own benefit -- and that Rosenfeld subsequently admitted as such in August 2012. Finally, Plaintiffs allege that this fraudulent scheme resulted in significant economic loss. "These detailed allegations [relating to Defendants' alleged present undisclosed intent not to perform] are more than sufficient to enable the named defendants to prepare a responsive pleading to the charges presented." *U.S. ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 518 (6th Cir. 2009).

The facts underlying Plaintiffs' fraud claim (Count V) also sufficiently put Defendants on notice of an alleged past misrepresentation, therefore allowing Defendants to answer Plaintiffs' charge.  In 2008, Plaintiffs assert that Defendants represented to Plaintiffs that it had not received a shipment of 480 units of IGH-1 60 Count promotional supplements.  Plaintiffs reshipped an additional 480 units, which Defendants then packaged and resold these promotional units as their own, to the tune of $7,188.00 in profit.  In so doing, Defendants negatively impacted Plaintiffs' retail sales of these units.  Plaintiffs' fraud claim is sufficiently pled.[5]

In sum, Plaintiffs have pled their fraud claims (Counts IV and V) with sufficient particularity to put Defendants on notice "to prepare a responsive pleading to the charges presented."  *Poteet*, 552 F.3d at 518.

### 5.    Sanctions are not appropriate

Finally, Defendants request that this Court sanction Plaintiffs and their counsel pursuant to Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927. (Defs' Mtn., Dkt. # 19).  In so arguing, Defendants just replicate their substantive arguments made in their Motion to Dismiss, and therefore conclude that:

> As a matter of law, the claims purportedly asserted by Plaintiffs are without legal merit, and are not based upon a good faith argument regarding existing law or the extension or modification of existing law. . . . Plaintiffs' pleadings here appear to have been filed for the

---

[5] Defendants' alternative argument that this Court does not have jurisdiction over this claim because it asserts damages of fewer than $75,000 is predicated upon the dismissal of Plaintiffs' other claims and is therefore moot.

purpose of attempting to extort some settlement from Defendants, and
not because there is a valid claim under Michigan law to be asserted.

(*Id.* at 4).   As Plaintiffs adeptly observe, Defendants essentially argue that their

Motion to Dismiss is so "airtight" that Plaintiffs' failure to dismiss their lawsuit

mandates sanctions.   (Plfs' Resp., Dkt. # 22, at 11).

Having addressed the merits of Defendants' arguments with regards to the

sufficiency of Plaintiffs' Complaint above, it should come as no surprise that

Defendants' Motion is without merit.   In no uncertain terms, Defendants' position

on the frivolity of Plaintiffs' Complaint -- that it is -- is just plain wrong.   Their

presumptuous arguments containing conclusory and hyperbolic language,

moreover, certainly do not advance a level of discourse to which counsel should

ascribe.   *Cf. Bennett v. State Farm Mut. Auto. Ins. Co.*, --- F.3d ---, 2013 WL

5312398, at *1 (6th Cir. 2013) ("There are good reasons not to call an opponent's

argument "ridiculous." . . .   The reasons include civility; the near-certainty that

overstatement will only push the reader away (especially when, as here, the

hyperbole begins on page one of the brief); and that, even where the record

supports an extreme modifier, 'the better practice is usually to lay out the facts and

let the court reach its own conclusions.'   But here the biggest reason is more

simple: the argument that [Defendant] derides as ridiculous is instead correct.")

(internal citation omitted).

25

There is a fine line between zealous advocacy and sanctionable conduct. In the future, Defendants and their counsel would be wise to not toe that line so closely, less they find themselves hoisted upon the petard of their own arguments.

## IV. CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motion to Dismiss Plaintiffs' Amended Complaint [Dkt. # 15] is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion for Sanctions Pursuant to Rule 11 [Dkt. # 19] is DENIED.

**IT IS SO ORDERED.**


Dated: October 28, 2013        s/Gerald E. Rosen
                               GERALD E. ROSEN
                               CHIEF, U.S. DISTRICT COURT


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, October 28, 2013, by electronic and/or ordinary mail.

                               s/Julie Owens
                               Case Manager, 313-234-5135

26